I am apprised by the clerk that everybody is here on all the argued cases, so I'm going to dispense with reading the calendar and thank you for your timely presence. But let me before we begin also thank Judge Berman. Judge Berman is sitting with us from the Southern District and we are very grateful for the help of our district court judges in dealing with our busy calendar. So I'm going to turn it over to Judge Berman for World of Boxing. May I proceed? Yes, please. Good morning, Your Honors. May it please the court, I am Peter Shawk of Judd Bernstein PC and we are the counsels for the Plaintiffs, Counter Defendants, Appellants, and Cross Appellees Deontay Wilder and DiBella Entertainment. Mr. Wilder is and always has been for all relevant times here to the World Boxing Council, I'll refer to as the WBC heavyweight champion of the world and DiBella Entertainment, which I'll likely refer to as DBE, is his promoter. He upheld that position over the weekend, I think, at the Barclays Center. Yes, yes, in fact he had an excellent victory two days ago, thank you, Your Honor, and retained his title. So this case concerns not that fight but a fight that was scheduled for May 21, 2016. It was supposed to go forward in Russia against a mandatory challenger that the WBC had designated for Mr. Wilder to fight, Alexander Pavekin. That fight was going to be promoted by Mr. Pavekin's World of Boxing, which is a Russian entity. Now the fight didn't happen and that's why we're here and the reason it didn't happen is that Mr. Pavekin tested positive for the banned substance meldonium immediately prior to the fight going forward. What's important here, he was tested on April 7th, 8th, and 11th of 2016 and was negative for all those tests. Then on April 27th, just positive. So that gave rise to the palpable inference that he took the drugs after his last test when he thought he wasn't going to get caught and before the fight. So at that point in time, the WBC, there's no legitimate dispute here, it called off the fight and it said repeatedly that the reason it called off the fight was for the health and safety of the fighters. You'll hear my adversary argue that actually the WBC was cowed into not having the fight go forward by acts by Mr. Wilder, but as the district court appropriately held, there's literally no admissible evidence to support that claim and they'd have to determine that the WBC lied repeatedly about the reasons why it called off that fight. The fight, what's really important here, is the fight was private organization, it specifically included a broad mandatory forum selection clause in exclusive for the Southern District of New York. So the WBC said if there's a claim arising out of this agreement, you have to litigate it in the Southern District of New York. Didn't there also include provisions for mandatory mediation and mandatory arbitration and actually first step before that referring to actually clauses in their rules regarding claims against the WBC? I didn't read it that way. Well, both sides here actually read it that the mandatory forum provision allowed us to sue here because we sued on June 13th, 2016 and they followed 10 days later on June 23rd, 2016 with their own claims. No one's argued exhaustion of remedies that hasn't really been raised in this case. I'm raising it. Well, the WBC has, if you're raising exhaustion of remedies, there were subsequent decisions by the WBC that are in the record where they specifically said it's going to allow the jury to determine this dispute, whether or not- I know there's also, and I know about the clause that says Southern District of New York and all that, but why would you agree to that kind of a concept, mandatory mediation, mandatory arbitration you didn't think that would be valuable here? These are, after all, the organization that knows about boxing. Respectfully, we believe that we're going to get a fair shake with a jury trial. There's a lot of issues regarding the fact that Mr. Rabinsky, he's an oligarch. He's paid a lot of money for WBC events and the WBC included a provision that gave us a mandatory forum selection clause, so we took advantage of that and veiled ourselves with that. What about the district court magistrate judge's determination that there is another problem, that this contract seems to, setting aside mandatory arbitration, does seem to delegate to WBC the authority to make determinations regarding things like postponement and also what, how anti-doping problems should be investigated and what should flow from those allegations? Well, and I think Your Honor is referring to also generally the case law that allows there to be substantial discretion to private organizations. What happened here, which is crucial, it's in the record at 8A-856, there's an October 7, 2016 decision from the WBC where it specifically ruled that for the avoidance of doubt, the WBC hereby states that the WBC ruling was not intended to convey and should not be construed as conveying a conclusion about whether Mr. Pavekian did or did not take meldonium. The litigation pending between Wilder and Pavekian is going to trial on February 2017. If Mr. Wilder prevails at that trial, the WBC shall afford Mr. Pavekian the opportunity to show that the result was not based on a finding that he ingested meldonium. That's all they were going to let him do. Then he would have a chance to have lesser penalties. Another lesson. There wasn't a last word on that by them. Say that again? There wasn't a last word by WBC about this situation. That, that is true. Well, it's more than true in the sense that they reversed themselves, actually, and came to a different conclusion. They reversed themselves after the trial, which the judge directed the trial go forward and specifically cited the October 17th decision in directing a one-issue trial. So the district court said, we're going to go, because the WBC has said that we're, we are going to, we're going to let the jury decide this. We're going to go forward on this one-issue trial in reliance upon that. We, we had a trial. But correct me if I'm misremembering the record, but in November 2017, the WBC revisited the issue and said, uh, setting aside what we said before, it's not possible. We conclude it's not possible to ascertain when the ingestion of the substance took place. This is absolutely true. In a decision that was rendered in November 2017, what happened first in March 2017, they adopted the jury's decision and they suspended Mr. Bevecchian indefinitely and they fined him $250,000. They said they adopted the jury's decision. Then they, they filed an appeal. It's also notable, they didn't appeal the October decision. That should have stayed binding. They never appealed that decision. There's no evidence they appealed that decision and we should have been allowed to rely on that decision to go forward for this trial and not waste the jury's time and everyone else's time. To have a situation, if the WBC wants to have it both ways, so if you have a forum selection clause, we should be allowed to litigate in the Southern District. It shouldn't have a situation where they, um, where they just become an appellate court to the jury and nullify, the jury spent five days on trial in this matter. Generally speaking, you don't let, this is not a situation where we first went to WBC, didn't like the decision, and then went to the courts. That had, that's in the NFL case, that's in the Crouch case, all of those cases, the Charles O. Finley case, they specifically abrogated their rights to go to the court. That didn't happen here. There's a contract drafted by the WBC that says we can come to this court. Then they pull a bait and switch after the trial. So, that's why I go back to my original question. You used the expression, having it both ways. So, if you're adopting or would like to adopt some of the decisions of the WBC that directly focus on the issues presented here, why do you reject arbitration and mediation clauses? Well, because. That's what I mean by having it both ways. I respect that. I didn't read that provision the way Your Honor is reading it, so I'm not. It's never been a dispute between the parties, certainly, that they had a right to come to this court in the first instance. And in fact, it was a mandatory forum selection clause. You don't think that if you went to the WBC, have they ever done mediations or arbitrations, to your knowledge? They have done mediations and arbitrations, but generally, in their rules, it's specifically about claims brought against them. That's the mandatory arbitration. This was about agreement between private parties. That they said, if you private parties have a dispute about this agreement, you can come to the Southern, you have to go to the Southern District of New York. And we did that. And to do that, to go to a trial and to rely upon a decision saying, we're going to let the jury decide this. And then, when we have a decision that literally says, when we issue this decision, we're going to get paid $250,000. Immediately upon issuing a new favorable decision, that we can just nullify the entire. There's a reason. There are appellate procedures. They had a post-trial motion at which they was resoundingly rejected. They make the same arguments that they did in the post-trial to the WBC. And so far as we can tell, because it was ex parte, we had no opportunity to know what they're doing to the WBC, what they're saying behind it. I understand that you have a lot of concerns about what motivated the WBC in its various actions over time. Nonetheless, in your arguments about breach, about the ingestion of meldonium, and the materiality of the bout date within a couple of days, maybe. It still seemed that the bout agreement and the rules, including the rules that say an athlete should not ingest meldonium, but this is not, or it was forbidden substances, but this is not a strict liability regime, and that the WBC is entitled to take into account all kinds of circumstances. WBC seemed to be acting within its rules and regulations, which governed the whole relationship. And that seems to me to break all of the chain of causation in your arguments about the import of what W.O.B. and Mr. Wilder, Mr. Pavetkin did, causing breach. There was so much power and discretion vested in the World Boxing Council that there was nothing left to be breached. You guys got it wrong. Well, I think that, respectfully, why I disagree with your honor is there's a provision in the bout agreement that's very important. It says A707, section 7. And it says that no party, including the WBC, including the WBC, and the WBC wrote this, may interfere or dictate any of VADA's course of action. VADA is the company that actually performs the testing. It hired it out to UCLA Lab. What the WBC did, it has all discretion in the world to decide a penalty upon Pavetkin. But what it doesn't have discretion to do, and it actually gave it up, is to say that, you know what, VADA's wrong, we're not going to agree with what VADA did, and the jury's wrong. That's where I think they gave up that discretion, especially in that October decision. I'm going to interrupt, though, for a minute, because you've argued that the May 21 bout date was material, and it was the postponement that caused a lot of these damages in the subsequent course of events. The provisions about VADA in paragraph 7 don't bear on that. Surely the WBC had the authority to postpone based on the sequence of testing results that it had received, right? The WBC could have postponed the bout, and it could have ordered another fight. It never did that. It did postpone. It did postpone, but it never ordered another fight. And what it did instead, it directed Mr. Pavetkin to fight his very next fight, a mandatory bout against a WBC opponent. And what does he do? He tests positive for osterene, and that's two doping violations in a row. That's why he never got his rematch, because he tested positive again. The WBC could have ordered another fight. Didn't they say, because we're going to undertake an investigation? That was the explanation. That was the initial explanation. But then, after both the jury... There's a March 2017... They did, in fact, undertake an investigation. And initially, what they said was, we're going to do an investigation. And they said, but whatever our investigation does, we're not going to disturb the jury's verdict. Then in March, after the jury's verdict, and after he tests positive for osterene, it suspended him indefinitely. Once you're suspended, he can't have a title fight. It's a completely self-inflicted wound by Povetkin. Certainly, if the WBC performed an immediate investigation and said, go to Russia right now and fight, Deontay Wilder would have done that. We'll never know, because that didn't happen. What the WBC did was perform an investigation, say that because Mr. Povetkin doped, Deontay Wilder can have an interim fight. Then Mr. Wilder fights that fight against Mr. Areola, injures his hand. So they say, okay, Mr. Povetkin, you can go fight a WBC fight while Mr. Wilder is getting better. He then dopes, gets caught, and is suspended indefinitely. But when Mr. Wilder comes back, he was suspended. He wasn't even put in the rankings until January 2018. As of January 2018, he wasn't even a ranked fighter. So the cause of events, and the district court judge was very clear, the proximate cause of the fight not happening was Mr. Povetkin's doping. That is unequivocally clear. And the district court says, it's dispositively established by the jury that he ingested meldonium when it was banned. But somehow, and before we went to trial, the district court judge said, there's only going to be one issue in this case. The only issue in this case is whether or not he took meldonium when it was banned. That's why we had that trial. That's what the WBC said, we'll let the jury decide. And then after, when they don't like the decision because it isn't favorable to their benefactor, oligarch, they just reverse themselves and get paid $250,000. At a minimum, we should get discovered on that. I see I've exceeded my time a lot. Thank you, Judge. You've reserved some rebuttal. Good morning, Your Honor. May it please the court. I'd like to begin by answering Judge Berman's question about the Article V of the WBC rules. I think both parties understood that those rules applied to them because both parties, during the course of this dispute, invoked their Article V rights. Wilder invoked his Article V rights in August of 2016, objected to the WBC's decision reinstating Pevec and clearing him, exonerating him. The result was this October of 2017 announcement in which the WBC said, we're going to wait and see what happens in the district court. Things went on from there. The idea that Wilder either was unaware of or didn't think that that Article V provision applied to him is belied by the record. That's the first thing. If I may, I'd like to turn to the issue of repudiation and focus the court on the six weeks following this announcement of the questionable test. The weekend of May the 13th, the WBC decided that they were going to investigate this situation, and they said in their internal documents and in their external documents, we're imposing no penalty on Pevec. Wilder's response to that was very clear. He rejected the WBC's position. He declared breach in writing. He announced breach in the newspapers. He terminated performance, and by June 13th, three weeks after performance was due originally, June 13th, he commenced a lawsuit. Now, a party's allowed to do that. A party's allowed to declare a contract terminated, treat it as breach, and bring a lawsuit. If it turns out they're correct, then they can seek damages. If it turns out they're incorrect. Your adversary has a very persuasive argument that the May 21 date was a material term of the contract. He had traveled, Mr. Wilder had traveled to England, was busy getting ready with his staff and crew, and where a physical bout is concerned, it seems to me very plausible that maybe a one or two day suspension would be tolerated, but within a week, something much less than the months, and there was no final decision until November. That seems to me a reasonable response to your argument that this was repudiation. Why is that wrong? So, for two reasons, Your Honor. First of all, the contract expressly vested the WBC with discretion to control the schedule of the bout. That's rules 3.1, 3.6, and 3.8 of the WBC's rules. Where the parties invest discretion with a third party to control the schedule, and the party exercises that discretion in good faith, the parties to the contract are bound by that. You mean no one was really bound by anything about the date or about anything because the WBC had discretion to postpone it indefinitely? They didn't have discretion to postpone it indefinitely. They had to exercise their discretion in good faith and consistent with applicable law, of course. But the obligation was still clear, that the date was the time that the individual had to be produced. That's true, but the other thing is that postponement of boxing matches is, although not common, not unheard of. Postponements happen all the time for injuries or for other reasons. The record is full of admissions from Wilder's side, and quite frankly, the reported opinions even in this court talk about postponements of boxing matches. Postponements that are caused by an individual's voluntary act, which was found by a jury here, the two have been the ingestion of meldonium, which was an act that surely warranted at the least investigation, wasn't it? Well, I think that the ingestion of meldonium, look, the time of ingestion of meldonium was hotly contested at trial. A jury found, based on expert evidence, that it likely occurred by preponderance in that window. Well, it did, and I want to stand on our briefs. I'm happy to answer questions about what happened at trial. I think there were a number of errors. I think there were a number of things that happened that were quite unfair to Povetkin. I think the fact that the jury asked for not a single document and came back after 30 minutes and found a Russian athlete accused of doping, it illustrates that this jury was moved by passion and prejudice. But did you agree to that trial? I did not agree to that trial, Your Honor. I was very clear that I thought it was putting the cart before the horse and that we wanted to move for summary judgment, but Judge Gornstein and Judge Carter wanted to keep the trial date. And I said, look, I don't want to keep the trial date. I moved for an extension six weeks before trial. I moved for another extension, and I was very clear that if you were going to try the case, you had to at least narrow it. But repeatedly, I asked for adjournments. And to do what in that adjourned time? Complete discovery. Discovery was never completed. We got documents that were used at trial against us that we never had the opportunity to ask a single question about. We got documents two weeks before trial. We got documents three weeks before trial. We asked for a deposition of the person who produced the documents, who testified as a combined fact witness and expert witness, and transmitted extensive hearsay to the jury, very unfairly. You didn't argue to the . . . Did you argue that holding a trial would be of no consequence because the discretion in this contract went to the WBC as to the doping . . . I did. I said to Judge Gorenstein, I think that the jury verdict will be advisory, and you shouldn't do that. And Judge Gorenstein rejected that. So off we went. Now, when you think about . . . what we see in the New York cases is time is of the You have to exercise the option within a certain period of time or it expires worthless. Other kinds of contracts, time is not of the essence, and if there's a reasonable postponement, that's not a breach. And so the question is whether this is the kind of contract in which the date was immovable. And both . . . It were immovable by a few days, given the displacement to England and so on. What's your position? Was he . . . Did Mr. Wilder have an obligation to remain available to fight your client as long as the investigation would take? So potentially six months, seven months, and to be ready in what circumstance? Well, as it turned out, I don't know the answer to what's the outside time limit, Your Honor. It's a fair question. And of course, that would be a judgment call. But in the actual event . . . I mean, and I will say that Mr. DiBella, who served as an expert in another case in California, and he testified as an expert witness in that case that a six-month postponement would not be unreasonable. So six months is not an unreasonable amount. WBC also authorized the interim fight, right? Correct. Correct. Correct. Again, it had a lot of discretion, as you just argued about. Without question. But the WBC did not say, go ahead and file a lawsuit. Mr. Wilder, of his own accord, three weeks after the May 21st date, filed a lawsuit. And it was only two weeks after that. Two weeks later, the World Anti-Doping Authority came out with its final guidance, in which it said, if you're below 1,000, you're not disqualified. And Pavekan was 70. But that wasn't the governing standard at the time that the testing was done. Isn't that correct? Didn't the standard change between April and the issuance that you just referred to? WADA had 496 false positives in 2016. And they knew within a month or two that they had a problem. They issued initial guidance on April 11th, the day the contract was signed. Are you saying WADA? WADA. The Russians have trouble with that, too. But World Anti-Doping issued a... WADA is a small organization headquartered in Las Vegas. World Anti-Doping is the one that sets the scientific standards. And in April of 2016, they announced, we have a problem. We realize that there are a lot of false positives. Nobody's getting disqualified until we figure this out. And we're working as fast as we can. And we will provide further guidance. But in the meantime, you don't have to disqualify somebody if they're below 1,000. And that was April 11th. Does that change? Even if we were to accept that as the governing standards, does that still explain the variation, the two negatives in April, the one positive, and then another negative in May? That was apparently based on a diluted sample. So the science... It appears from the scientific record that all of Pavetkin's urine samples had some traces of meldonium. But UCLA had a problem with the first three tests. And so rather than say he's negative or he's positive, they issued final reports. Dr. Butch testified that they were similar to meldonium in the spectrometry, but they were definitively not meldonium in the first two samples. Is that wrong? That is what he testified. And yet the UCLA final reports, the authoritative UCLA reports, didn't say that. And his basis was documents that he produced a week before trial and I never got to question him on. And I believe that had we had the opportunity to question a fact witness, a percipient witness, which Butch admitted he was not, that percipient witness would have said, we couldn't decide whether meldonium was in his urine or not in his urine from those earlier tests. And so we simply didn't report. We remained silent. Dr. Butch not qualified to read the spectrometry results? Um, I had a lot of problems with Dr. Butch's qualifications. I was overruled on that and I didn't appeal that issue. But, but Dr. Butch had a limited experience reading mass spectrometry. And most important, he was not a percipient witness. He was not a percipient witness. And so he's, he's testifying as if he was a fact witness when in reality he wasn't. And, and the jury, that, that is a recipe for confusion. And this court has warned against it. And in fact, this court has reversed because of, of that toxic mix. But the, the reality is that all of this is superseded by the discretion invested in the WBC by the parties in their contract. Court. Can you address, so you began with the anticipatory repudiation argument. Can you address the district court's, uh, determination that you have a causation problem? Yeah. So, so I, I think that was legal error, Your Honor. And the reason I think it was legal error is because the district court, sua sponte, said that Pavetkin had not proved what the WBC would have done. That was the phrasing of the district court. So the, that imposition of uncertainty on the non-repudiating party, it was a legal decision that, that Judge Gorenstein made. And it is contrary to the holding of Judge Weinfeld in King World against Financial News. And in King World, Judge Weinfeld said, when there's uncertainty caused by a non-repudiating by a repudiation, that uncertainty falls on the repudiator, not on the non-repudiator. And it was a very similar situation that the question was, what would the landlord have done? The landlord was meant to approve or not approve a sublease. The subtenant breached the, the sub lessor sued for anticipatory repudiation. And the defense was, well, we don't know what the landlord would have said. And Judge Weinfeld said, no, that's not fair to the repudiator. And this court affirmed in one of those per curiam, you know, we affirm for substantially the reasons stated by Judge Weinfeld. So, so as a matter of law, that was obvious legal error. And the legal standard here is there are two possible ways to show that, that Wilder's repudiation, his termination, his determination to treat the contract as terminated, sue for breach, caused damage to Povetkin. The first is, the WBC itself said, in its August ruling, the WBC said, we've cleared Povetkin and he's now going to box the next highest available contender. Had Wilder been available, which he was not available because of his voluntary conduct, had Wilder been available, that would have been a, Wilder's unavailability was a substantial contributing factor. What damages did your client suffer? So Povetkin was going to be paid for stepping into the ring. He had a fixed, he had a guaranteed minimum simply for stepping into the ring. And then if he won, which there was evidence that he was a serious contender, if he won, he would have gotten a bonus. And then World of Boxing had television rights, internet rights, and of course the gate. So they, they intended to make money by staging the bout. When was the Austerine test? The Austerine test was December of 2017, 2016. So the same year. Later that year, yeah. And, and the Austerine test, the evidence which the WBC found persuasive was that, that Austerine was, was a contaminant. Because he, he, he was negative for two tests before this Austerine test. And, and the Austerine was, was a very low level. The expert, the expert testimony to the WBC was that it was a contaminant. It wasn't like. I, I was confused also about the length of the suspension. When was the suspension imposed by the WBC and how long did that last? This, the suspension was an indefinite suspension. It was imposed on March the 2nd, 2017, shortly after the jury verdict came out. We immediately appealed. The, the WBC took a period of time to consider the appeal. I think quite frankly, they were waiting for the district judge to rule on the motion for a new trial. And shortly after the motion for a new trial, they came out and said, well, notwithstanding the jury verdict, we, we don't agree with, we don't agree with that. And they then dissolved the suspension, put them back on. Okay. Thank you very much. Thank you. Um, your honor, may I have one minute for rebuttal on the cross appeal? Um, yes. Okay. Thank you. So counsel, now we've got a big mess, right? We've got a unusual jury verdict, but only on a single issue. Uh, we've got a pending defamation suit, right? We've got a handful of decisions by the world boxing council, which are or are not consistent with, uh, the jury verdict, for example. Um, so I don't know where we are. I mean, the thing is all tied up, got a separate issue about the escrow agreement and the $4.4 million, which I guess is still in escrow. Um, is this a lawyer created mess or, uh, or what? Well, I don't think any lawyer asked Mr. Rebeckin to ingest meldonium during a time of his ban. Yeah, we, I, we get that. So I wouldn't say it's a lawyer. I, I, the escrow agreement, we actually argued to the district court judge that the escrow agreement had was ambiguous because it gave either party the absolute right to direct that the money be held in escrow, but then it's separately, um, said that if the fight happens, you get the money back or if it doesn't happen, you don't. So it was an oddly worded agreement, but the, as the district court judge held, we had an unfettered right to direct that the money be held in escrow pending a litigation. And under their reading, there's no conceivable, reasonable litigation that could ever happen. Um, and the district court judge also held that the only reason for the escrow agreement was to hold Mr. Wilder's purse safe because it's a Russian fight with a Russian promoter. Um, I will agree. It's a mess. I think the easiest way to clear up the mess is to go back to the jury stand in an appellate role to our jury. If I could just quickly deal with some of the issues raised by my colleague here, um, he references the fact that we brought a lawsuit in June, 2013, June 1st, 2016, Mr. Yalowitz wrote the escrow agent, actually wrote Mr. Wert, counsel for, um, Deontay Wilder and said, if you don't release that money from the escrow account, I'm going to sue you for two and a half million dollars in liquidated damages. So while he's saying that Mr. Wilder is suspended in animation and can't do anything until the WBC decides what's happening. He's also saying this bout agreement, which said you would get your purse held in escrow. That condition doesn't apply. Give me back my money. So, so the idea that we sued precipitously when he was threatening to suit for liquidated damages in two and a half million dollars, I think is not very well taken. I also, as your honor was pointing out about the materiality, their own expert, it said eight, 1970 paragraph eight, their own expert says it's a material term, the date of the fight. So the idea that it's not a material term, I think is not also not well taken. The causation question, Judge Gorenstein adopted their view on causation. They argued to the district court, you had to show causation. Then now he comes to this court and says, oh, that was a clear error of law when the district court judge adopted his own formulation. And in fact, this court has clearly held that you still have to show causation, even if there's an anticipatory repudiation, which there couldn't have been here because the date for performance had passed by the time the conduct they're claiming was a breach occurred. But if you look at overseas, U.S. Overseas Airlines versus Compania, 9, 246 FedSecond, 951 and 952, CAVE failed to carry its burden and consequently it cannot obtain damages for USO's anticipatory repudiation. CAVE also failed to meet its burden of proving that USOA's breach was the proximate cause whereby it lost its damages. There's no authority getting rid of the proximate cause requirement for anticipatory repudiation. He still has to prove that. This issue about him not having a fair opportunity with these documents, I was involved in the discovery in this case. We asked for them to release the vial numbers for the negative tests so we could get more information. They refused. They forced me to make a motion to compel that information. That's why both the district court, Judge Gorenstein and Judge Carter found that the responsibility for any delay was on them. And this is Arnold and Porter. They have hundreds of lawyers. We have four attorneys. We weren't complaining about going to trial. We could get ready for trial. They could clearly get ready for trial. And it was entirely a self-inflicted wound. This issue about Mr. DiBella's testimony in another case is really unfounded. One, he said that it wasn't okay to have an adjournment under the facts of that case. And two, it was an MMA case. It wasn't a professional boxing case, let alone a world heavyweight championship where so much goes into promoting the fight for that specific day, which is why their own expert agrees that it's a material term of the contract. And the notion that the WBC bought this argument that Ostring was just a contamination and was somehow innocent. It's still fined him $250,000. That's an astronomical fine for the WBC to level. I defy them to find a fine that's close to that. And so the idea of a boxer for an innocent doping, and what's really interesting is it's the same $250,000 that they were going to impose when they thought it was meldonium. So I do think there's at least some grounds to look with some suspicion on the good faith of the WBC in issuing that November decision when it specifically said, I'm going to get $250,000 immediately upon issuing of it. Any questions, Your Honor? Thank you. Your Honor, unless the court has questions, I don't think I need to respond to any of that. Thank you both. Well argued by both sides, and we'll take the matter under advisement.